Juan R. **ENRIQUEZ, Plaintiff,**

v.

**W.J. ESTELLE, et al., Defendants.**

No. H–73–900.

United States District Court,
S.D. Texas,
Houston Division.

Nov. 12, 1993.

Juan R. Enriquez, pro se.

Jo Anne Bernal and Adrian Young, Asst. Attys. Gen., Austin, TX, for defendants.

OPINION ON SANCTIONS AGAINST THE
ATTORNEY GENERAL OF TEXAS

HUGHES, District Judge.

### 1. Introduction.

Responsibility is individual. In a hierarchy, the lowest individual is responsible for her acts, and the highest individual is responsible for his acts as well as the acts of those below him whom he uses. Occasionally, a worker will go bad, but generally workers respond as well as they are led. No exalted position allows a "leader" to hide behind the skirts of young, new, but misguided lawyers.

### 2. Chronology.

A. *November 17, 1992.* After dismissing the case in July 1992, the court reinstated it on November 17th. The court ordered the state to answer Juan Enriquez's amended complaint by December 11th.

B. *February 18, 1993.* Enriquez moved for a default judgment because the state did not answer his amended petition.

C. *April 1993.* The state represented to the court that it did not receive a copy of Enriquez's amended petition. Also, the state represented that it checked the docket entries in the court's online computer system and that the amended petition was not listed as a docket entry. The clerk of the court did not enter the docket sheet into the system until May 17, 1993.

D. *April 16, 1993.* The court ordered the state to answer by May 7, 1993, and denied without prejudice Enriquez's motion for default.

E. *May 11, 1993.* Four days after the state's answer was due, the state moved for an extension of time to file its answer, citing a variety of excuses including a March illness and the length and complexity of Enriquez's amended complaint.

F. *May 14, 1993.* The court allowed the state until June 9, 1993, to answer Enriquez's amended petition. Due to the state's inexcusable delay in answering the amended petition and in filing its motion for an extension of time, the court ordered the state to pay $100 in sanctions to Enriquez to compensate him for the time and effort he spent attempting to force the state to comply with basic procedural rules. The state was to pay Enriquez by June 9, 1993.

G. *May 24, 1993.* The state moved that the court reconsider the order to pay sanctions. The state also moved for sanctions against Enriquez on the ground that he never served it with a

copy of his amended complaint. The court denied this motion on June 21, 1993.

H. *June 9, 1993.* The state filed a three-page answer to Enriquez's amended petition.

I. *June 10, 1993.* Enriquez reurged his motion for default. It was denied at a show cause hearing on July 26, 1993.

J. *June 21, 1993.* Enriquez moved for contempt against an assistant attorney general because the state did not pay him $100 by June 9, 1993.

K. *June 28, 1993.* The court sanctioned the state $200 for flagrantly disobeying the order to pay Enriquez $100 in sanctions. The $200 sanction was to be paid to the court on July 12th. The court reiterated that the order to pay Enriquez subsists, as it had since May 14, 1993.

L. *July 1 & 6, 1993.* The state filed motions to stay enforcement of the order to pay Enriquez $100 in sanctions pending appeal.

M. *July 9, 1993.* The court denied the motion for stay pending appeal and again reiterated that the state should have already paid Enriquez.

N. *July 12, 1993.* The state paid the $200 in sanctions to the court. The state also gave the court a check payable to Juan Enriquez with a request that it be deposited into the court's registry until the appellate court heard the appeal of the order for sanctions.

O. *July 26, 1993.* A show cause hearing was held. The court sanctioned the state an additional $600: Attorney General Dan Morales personally earned $500 of the total sanctions.

3. *Responsibility over Privilege.*

■ The Office of the Attorney General is a useless abstraction. The state's litigation is conducted by individual people. When one of those people is dilatory, obstructionist, disobedient, and dishonest, another person is responsible; that person is Dan Morales. When several of them act badly, the individual responsibility is clearly fixed on the person of the attorney general. He sought the office, and he bears all of its responsibilities. Those responsibilities include not only hiring lawyers, but training and supervising them.

"Equal justice under law" does not have an exception for attorneys general, elected or appointed, public or private. Government lawyers have no special license that exempts them from the strictures of the procedural rules, professional behavior, and individual responsibility.

The court ordered the attorney general and three of his assistants to appear at a show cause hearing to explain their behavior. The state applied to the court of appeals for a writ of mandamus, claiming Morales was too busy and too important to explain his misbehavior; it asked that he not be required to appear in person and that the state not be sanctioned for its behavior. The court of appeals excused Morales's personal appearance.

The state accuses this court of bias because this is the second time the court has ordered the attorney general to appear personally. *See Ewing v. Beaird,* C.A. H–89–3097. Morales has never been ordered to appear except in the face of absolute, categorical disobedience. Apparently, Morales has a policy of attacking the court for bias rather than appearing to address his conduct of litigation. As long as his office willfully and repeatedly disobeys court orders, Morales will be required to appear personally. If Morales and his office would make at least a good faith effort to obey court orders, the attorney general would not be asked to appear in person.

■ At the hearing on sanctions, the state's lawyers attempted to talk around their actions, rather than accept responsibility for them. The court questioned one lawyer about her earlier misrepresentation to the court that she had checked the case on the court's on-line computer docket system at a time that the case was demonstrably not yet in the system. Before she could answer,

her supervisor, Adrian Young, volunteered that the representation was not that the office had checked the court's docket system, but that it had checked its own "docket" system. Young said the court misunderstood the representation and was comparing apples and oranges. In actuality, the court was comparing lies and truths. Young attempted to protect Morales's worker with another lie. The other lawyer then admitted quickly to the court that her representation was indeed that her office had checked the court's docket system. Morales did not have to defend himself, so he sent a mid-level manager to dissemble further, rather than to accept that it had been caught. Errors happen; a dishonest attempt to obscure an error is the product of a conscious policy.

### 4. A Leader Must Lead.

People respond as well as they are led. The state's dilatory tactics, quarrelsome intransigence, and disingenuous responses that have pervaded this litigation reflect the attorney general. Dan Morales, whose name appears first on the pleadings, is responsible. The job of attorney general is important; the responsibilities of the position require difficult choices. No exigency of the government compelled these acts and the compounding of them. Morales has repeatedly made the policy decision to send otherwise competent counsel to court to equivocate, delay, and obfuscate.

No lawyer has unlimited credibility. When a new lawyer exhausts her credibility with the court, Morales can replace her. To him, young lawyers are expendable—their integrity is a consumable resource. The choice by Morales to victimize the little people of the office also victimizes this court, to the harm of the American taxpayers and waiting litigants. Worse, it deprives Enriquez of his right to litigate fully and fairly his claims against the state. Morales cannot impose the burden of his policy on his junior lawyers, the litigants, and taxpayers.

### 5. Cooperation and Respect.

Because of accidents of geography, a disproportionate number of state prisons are under the jurisdiction of this court. Conse-

quently, this court has a huge number of pro se prisoner petitions. To adjudicate these cases efficiently, the court has four full-time federal employees who screen cases filed by the inmates. Before the court ever issues a summons, it narrows the issues so that the claims are focused and only the proper defendants are sued. The court eliminates sua sponte 37% of the inmate cases without allowing the inmate to have a summons issued to the state.

This whole program saves the state, and the attorney general's office specifically, time and money. In the prison litigation section, the workload would be much higher if it were not for the court's efforts. The state never sees a large chunk of prisoner cases, and those that survive the screening process are better organized and focused.

Additionally, the judges of this court travel routinely to the state prisons to hold hearings with a view toward further narrowing the cases that must be fully litigated. This saves the state hundreds of thousands of dollars in transportation, security, and attorney's costs. If the judges did not travel to the prisons to hear cases, the lawyers for the state and the other governmental units would have to appear as each judge scheduled the cases. Instead, they can appear at one place, with one group of state employees and lawyers, to respond to a full range of cases.

The state does not pay for this service. The federal government extracts no consideration from the state, nor does it lower the prisoner's standard of proof. The court undertook this mammoth task, not for the state, but because it is the most efficient and just way for us to administer an open system of litigation—for us to do our duty. The state of Texas and its counsel, however, need to consider the extraordinary measures this court takes to minimize the state's cost of prison litigation before whining about impositions on their time.

### 6. Conclusion.

In this case, the Attorney General of Texas had two choices of position. Either he knew about and condoned the behavior of trial counsel, or he did not know about it. In

either instance, he failed in his responsibility to this court and to the people of Texas. Morales chose not to explain or defend his actions at the hearing. The lawyers who did appear fouled the process further. While it is not for this court to judge the efficiency of Morales's management of his office generally, it is clearly integral to this court's function to judge it when it procures dishonesty and incompetence in this court, as it clearly has in this case.

The best result for Enriquez, the defendants, and the taxpayers is to litigate each case with intelligence, candor, and industry. Enriquez is in prison because society held him accountable for his individual acts. The attorney general must also be held accountable for the acts of his office. The sanctions of $500 are only a gesture, but they are a symbol of his responsibility and of his failure.